

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

MARQUEZ T. HAWKINS, #1208249,

        Petitioner,

v.

        ACTION NO.  2:16cv269

HAROLD CLARKE,
Director,

        Respondent.

<u>**UNITED STATES MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**</u>

This matter is before the Court on Marquez T. Hawkins' *pro se* petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254, and the respondent's motion to dismiss.  This matter was referred to the United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia.  For the reasons that follow, the Court RECOMMENDS that respondent's motion to dismiss, ECF No. 10, be GRANTED, and the petition for a writ of habeas corpus, ECF No. 1, be DENIED and DISMISSED WITH PREJUDICE.

## I.    PROCEDURAL HISTORY

Petitioner, Marquez T. Hawkins ("Hawkins"), is in state custody pursuant to convictions in the Circuit Court of the City of Chesapeake ("trial court").  *See* Sentencing Order, ECF No. 12-1.  Following a bench trial, Hawkins was convicted of robbery, conspiracy to commit a felony, and use of a firearm during the commission of a felony on July 16, 2007.  *Id.*  On December 11, 2007, the trial court sentenced Hawkins to 63 years of imprisonment, with 43

years suspended, for a 20-year active term of incarceration. *Id.* at 1–2.

Prior to sentencing, on October 1, 2007, Hawkins, through counsel, moved to set aside the finding of guilt based upon new and material evidence. *Commonwealth v. Hawkins*, CR07-2021 through 2023 (Va. Cir. Ct. Oct. 1, 2007). The trial court held a hearing on November 20, 2007, and denied the motion.[1] *Commonwealth v. Hawkins*, CR07-2021 through 2023 (Va. Cir. Ct. Nov. 26, 2007).

On April 24, 2008, Hawkins, through counsel, filed a petition for appeal in the Court of Appeals of Virginia. *Hawkins v. Commonwealth*, Record No. 0053-08-1 (Va. Ct. App. Apr. 24, 2008). The Court of Appeals denied Hawkins' appeal on August 21, 2008, and a three judge panel denied his appeal on November 13, 2008. *Hawkins v. Commonwealth*, Record No. 0053-08-1 (Va. Ct. App.); ECF Nos. 12-2, 12-3. On June 22, 2009, the Supreme Court of Virginia refused Hawkins' direct appeal. *Hawkins v. Commonwealth*, Record No. 082446 (Va. June 22, 2009); ECF No. 12-4.

On March 25, 2008, Hawkins signed a *pro se* petition for a writ of habeas corpus that was filed in the trial court two days later. *Hawkins v. Johnson*, Case No. CL08-991 (Va. Cir. Ct. Mar. 27, 2008) ("State Pet."); ECF No. 12-5. On December 8, 2008, while Hawkins' direct appeal was pending, the trial court denied and dismissed his state habeas petition as procedurally barred. *Hawkins v. Johnson*, Case No. CL08-991 (Va. Cir. Ct. Dec. 8, 2008); ECF No. 12-6. The trial court found that Hawkins' claims "could have been raised and adjudicated at trial and upon his direct appeal from the conviction," and "to the extent that such issues are raised and

---

[1] At the hearing, defense counsel introduced a note purportedly written by Hawkins' co-defendant, which could have been construed as suggesting that Hawkins did not participate in the robbery. Hr'g Tr. 32–33, *Commonwealth v. Hawkins*, CR07-2021 through 2023 (Va. Cir. Ct. Nov. 20, 2007).

resolved on direct appeal, they may not be considered in a subsequent habeas proceeding." *Id.* (citing *Henry v. Warden*, 576 S.E.2d 495 (Va. 2003)).

On August 27, 2008, Hawkins, through counsel, filed a motion to "reconsider and modify [the] sentence," stating that a witness, Robert Montgomery ("Montgomery"), "has come forward, and has verified that through conversations with [Hawkins'] co-defendant, Derrick Armstrong, that said co-defendant admitted to having 'set up' [Hawkins]." Mot. to Recons. and Modify Sentence, *Commonwealth v. Hawkins*, CR07-2021 through 2023 (Va. Cir. Ct. Aug. 27, 2008). Hawkins attached Montgomery's notarized affidavit to the motion and requested a hearing in order to present Montgomery as a witness. *Id.* On September 2, 2008, the trial court summarily denied the request for a hearing, because "[t]here are no facts alleged to support a change in the case which warrants modification or reconsideration of the defendant's original sentence or which warrants a new hearing." *Commonwealth v. Hawkins*, CR07-2021 through 2023 (Va. Cir. Ct. Sept. 2, 2008).

On January 4, 2011, Hawkins filed a motion to vacate his convictions in the trial court. *Commonwealth v. Hawkins*, CR07-2021 through 2023 (Va. Cir. Ct. Jan. 4, 2011); ECF No. 12-7. The trial court denied his motion "because the Court does not have the authority to vacate the conviction and/or sentencing orders in this case, as they are final orders and twenty-one days have passed." *Commonwealth v. Hawkins*, CR07-2021 through 2023 (Va. Cir. Ct. Apr. 4, 2011); ECF No. 12-8. Hawkins appealed the denial of this motion to vacate, and the Supreme Court of Virginia dismissed the appeal on November 15, 2011, due to Hawkins' failure to file a notice of appeal in the trial court as required by Rule 5:9(a) of the Rules of the Supreme Court of Virginia. *Hawkins v. Commonwealth*, Record No. 111409 (Va. Nov. 15, 2011); ECF No. 12-9.

The Supreme Court of Virginia denied Hawkins' petition for rehearing on January 19, 2012. *Hawkins v. Commonwealth*, Record No. 111409 (Va. Jan. 19, 2012); ECF No. 12-10.

Hawkins filed a second motion to vacate in the trial court on February 15, 2012. *Commonwealth v. Hawkins*, CR07-2021 through 2023 (Va. Cir. Ct. Feb. 15, 2012); ECF No. 12-11. The trial court denied the motion on April 13, 2012, for lack of subject matter jurisdiction.[2] *Commonwealth v. Hawkins*, CR07-2021 through 2023 (Va. Cir. Ct. Apr. 13, 2012); ECF No. 12-12.

Hawkins signed the present federal petition for a writ of habeas corpus and placed it in the prison mailing system on May 18, 2016. ECF No. 1. The petition advances the following grounds for relief:

(1)     "Conviction obtained via insufficient evidence;"

(2)(a)  Counsel rendered ineffective assistance in "failing to conduct proper pre-trial investigation concerning actual innocence obtaining employment time card;"

(2)(b)  Counsel rendered ineffective assistance in "denying request for jury trial in lieu of judge trial;"

(2)(c)  Counsel rendered ineffective assistance in "presenting proof of prosecutor misconduct via affidavit of Robert Montgomery, whom co-defendant confessed my actual innocence to;"

(3)     "Judicial and prosecutorial misconduct;" and

(4)     "Actually innocent of offense," as supported by the affidavit of Robert Montgomery.

ECF No. 1 at 5, 7–8, 10.

On October 26, 2016, respondent timely filed a Rule 5 answer and motion to dismiss with memorandum in support. ECF Nos. 9–12. Hawkins filed a reply to

---

[2] The order references Hawkins' letter and motion dated December 26, 2010, but such reference appears to have been made in error.

respondent's motion to dismiss on December 14, 2016.  ECF No. 15.  Accordingly, this

matter is ripe for review.

## II.    FACTUAL BACKGROUND

According to the Court of Appeals of Virginia, the evidence presented at Hawkins' trial,

when viewed in the light most favorable to the Commonwealth, established the following:

> [O]n November 15, 2006, Derrick Armstrong [Hawkins' co-defendant]
> entered a fast-food restaurant, waved a gun, and demanded money.
>
> Armstrong testified that a week or two before the robbery, [Hawkins] had
> suggested they rob the restaurant where [Hawkins] worked.  Over the course of
> several conversations, [Hawkins] provided Armstrong with details of the
> restaurant's layout and routine, including where the safe and panic buttons were
> and who would be working at the time of the proposed robbery.  [Hawkins] drove
> Armstrong to the restaurant.  Armstrong entered as planned, displayed a BB gun,
> ordered the employees to get to the ground, and then took money from the safe,
> which was open, as [Hawkins] had predicted.  Armstrong left through the back
> door where [Hawkins] was waiting.  They then fled the scene.
>
> Kristen Hall testified she worked at the restaurant and that the day before
> the robbery [Hawkins] told her that he and Armstrong planned to conduct a
> robbery there.  [Hawkins] called her at work the next evening and warned her that
> it was about to happen.  Five minutes later, Armstrong entered the restaurant.
>
> [Hawkins] admitted having worked at the restaurant, but denied having
> been involved in the robbery or discussing it with Armstrong.

*Hawkins v. Commonwealth*, Record No. 0053-08-1 (Va. Ct. App. Aug. 21, 2008), ECF No. 12-2

at 1–2.

During opening statements, Hawkins' counsel told the trial court that, in testifying

against Hawkins, Armstrong was "trying to save his [own] skin."  Trial Tr. 25.  Counsel stated

that the evidence would show that Hawkins and Armstrong knew each other as the result of a

dispute they had about drugs or drug money, and that they also knew each other through Kristen

Hall ("Hall"), one of the Commonwealth's witnesses.  Trial Tr. 25.  According to counsel, Hall

was friendly with Armstrong at the time of the robbery, and "didn't care too much" for Hawkins.

Trial Tr. 25.   Counsel stated that Armstrong gathered information about the layout of the restaurant and when to rob it from Hall, rather than Hawkins.   Trial Tr. 26.   Counsel also indicated that, at the time of the robbery, Hawkins was at a residence in the presence of three witnesses, including Dawn Smith, who was pregnant with Hawkins' child.   Trial Tr. 26.

The Commonwealth called seven witnesses.   First, Armstrong testified as follows. Approximately one week prior to the robbery, Hawkins asked Armstrong to join him on a "sting," or robbery, of the fast-food restaurant where he worked.   Trial Tr. 29–30.   Hawkins said he could not go in the restaurant because he would be recognized, but that he would be the driver.   Trial Tr. 30–31.   During this conversation, Hawkins told Armstrong about the floor plan of the restaurant and the location of the three panic buttons.   Trial Tr. 29.   Hawkins directed Armstrong to "come in through the side door and leave out the back door."   Trial Tr. 30. Hawkins also informed Armstrong that the employees left the safe open "pretty much . . . all day" and that, when only women were working, "nobody would try and resist."   Trial Tr. 30–31.

The day before the robbery, Armstrong and Hawkins discussed "how to enter the store, where the safe was at exactly, and how to leave, and what time we had to be there."   Trial Tr. 32. Armstrong and Hawkins further agreed to arrive before 10:00 p.m., when the restaurant closed and the doors locked.   Trial Tr. 32.   Armstrong and Hawkins also had a conversation with Hall, during which Hawkins told Hall that they were going to rob the restaurant and that Hawkins would contact Hall on her cell phone beforehand.   Trial Tr. 33.

On the day of the robbery, Armstrong picked up Hawkins, and Hawkins drove them to the restaurant in Armstrong's car, a 2003 white Infiniti.   Trial Tr. 33–34.   Armstrong was wearing gray sweat pants, a gray sweatshirt, black sneakers, and a blue ski mask.   Trial Tr. 34. When they arrived, Armstrong got out of the car and entered the restaurant through the side

6

entrance. Trial Tr. 34. Hawkins "drove around the corner." Trial Tr. 34. Inside the restaurant, Armstrong told the employees to "get down" while pointing a BB gun at them. Trial Tr. 34–35. "Everybody [got] down on the floor," and then Armstrong hopped over the counter and went to the back of the restaurant to "make sure everybody's down." Trial Tr. 35. Next, Armstrong went to the safe, which was open, and emptied the contents into a pillowcase. Trial Tr. 35. He then went to the manager's office, looked around, and left "out the back entrance." Trial Tr. 36. On his way out, Armstrong dropped some change. Trial Tr. 36–37. When he exited, Hawkins "[wa]s there in [the] car." Trial Tr. 37. Armstrong got into the back seat and they left the scene. Trial Tr. 37. As they drove down the interstate, Armstrong threw his sweatshirt, sweat pants, shoes, ski mask, and the BB gun out of the car. Trial Tr. 37–38.

Hawkins told Armstrong that they "needed to go to Pughsville because we would need an alibi," so they drove to the Pughsville neighborhood in Suffolk. Trial. Tr. 38. They arrived at a residence on Hubbard Street where "Dawn" lived, and Hawkins went inside for approximately fifteen minutes. Trial Tr. 38–39. Armstrong did not go inside the residence. Trial Tr. 39. When Hawkins came out, he got back in the car, and he drove them back to Norfolk. Trial Tr. 39. Armstrong and Hawkins then divided up the money. Trial Tr. 39. They received "[a]bout $250 each. About [$]500 [total]." Trial Tr. 40.

On cross-examination, Armstrong testified that he knew Hawkins from "around the neighborhood and stuff" and that they "probably smoked marijuana a few times together." Trial Tr. 40. He stated that, after the date of the robbery, he and Hawkins got into a "minor dispute" over about $60.00 worth of drug money, which Hawkins said Armstrong owed him. Trial Tr. 41. Armstrong testified that, at the time of the robbery, he had known Hall for two months, and denied that she was his girlfriend. Trial Tr. 41–42. He also testified that when Hawkins told

7

Hall about the plan to rob the restaurant, Hall seemed "shocked," and that "[s]he was kind of silent. She didn't really say anything. She kind of couldn't believe it, that we was going to do it." Trial Tr. 43. Armstrong stated that he knew Hall would be working the night of the robbery, and that he did not notice her reaction when the robbery was taking place. Trial Tr. 51.

Armstrong also described a conversation with Hawkins regarding the planning of the robbery that took place at an apartment in Norfolk.[3] Trial Tr. 45–46. During this conversation, Hawkins drew out the floor plans on a piece of paper, indicating where the entrances, drive-through window, counter, safe, and panic buttons were located. Trial Tr. 46. Armstrong and Hawkins spent five to ten minutes going over the floor plans. Trial Tr. 46. After the robbery, Armstrong and Hawkins returned to the same apartment, which belonged to an acquaintance of Armstrong, to split the money. Trial Tr. 45, 52.

Armstrong testified that he was pleading guilty "to all the charges," and that he expected to receive consideration from the Commonwealth for his testimony. Trial Tr. 49, 53–54. He stated that he had three felony convictions, two convictions for grand larceny and one for possession of burglarious tools, and that he was on probation at the time of the trial. Trial Tr. 53.

Second, the Commonwealth called Kristen Hall. She testified that she had known Hawkins for "quite a few months" prior to the robbery, and that she had known Armstrong for "about a month or two." Trial Tr. 58. The day before the robbery, she was part of a conversation with Hawkins and Armstrong, during which Hawkins told her that "he was going to have [the restaurant] robbed, and, if I was to say anything, that I would be in trouble . . . . harmed in some kind of way." Trial Tr. 58–59. On the day of the robbery, Hall received a call from Hawkins while she was at work, and Hawkins told her that "it was about to happen." Trial Tr.

---

[3] Based on the testimony, it is unclear whether this conversation was part of the same conversation discussed in Trial Tr. 29–31, described above.

59. Hawkins asked her if the safe was unlocked, and she replied that she "wasn't sure." Trial Tr. 59–60. Approximately five minutes after the call, a man entered the restaurant, wearing a gray jumpsuit and a ski mask. Trial Tr. 60. He told everyone to get down on the floor, while waving a gun. Trial Tr. 60. Hall "was very scared and nervous." Trial Tr. 60. The man went over the counter, got "some stuff" out of the safe, and went to the manager's office. Trial Tr. 61. At that point, Hall lost sight of him. Trial Tr. 62. A customer then entered the restaurant and let the employees know "that everything was clear and that they were gone." Trial Tr. 62. Hall testified that Armstrong was the man who entered the restaurant. Trial Tr. 62.

On cross-examination, Hall testified that she did not tell anyone that the robbery was going to happen and that she went to work anyway because she was "so nervous" and had been "threatened for [her] life." Trial Tr. 67–68. She stated that she "didn't really know how it would go down," "didn't know guns were going to be involved," and "didn't know beforehand that Armstrong was going to be the one actually going in there and robbing." Trial Tr. 68–69. During the robbery, even though she recognized Armstrong as the robber, she "was still nervous" because "[h]e had a gun" and she "didn't know what was going to happen." Trial Tr. 69; *see also* Trial Tr. 74 ("It could have been my brother, and I still would have been scared for my life. He was waving [the gun] at everyone.")

Hall denied that she described the restaurant's layout to Armstrong, and denied having any part in planning the robbery. Trial Tr. 67, 72. She stated that she did not know when the safe was open, as that was the manager's responsibility. Trial Tr. 63. Hall later identified Armstrong to law enforcement, but not because they were threatening to bring charges against her. Trial Tr. 71. She testified, "I had no idea what was going to happen. I just told them what I knew." Trial Tr. 72.

9

Hall further testified that, when Hawkins started working at the restaurant, he was on the night shift, but he later changed to the day shift. *See* Trial Tr. 63. She denied that Armstrong was her boyfriend, Trial Tr. 65, but stated that she was aware of an argument that took place between Armstrong and Hawkins. Trial Tr. 66.

Third, the Commonwealth called Tamara Washington ("Washington"), the assistant manager of the restaurant. Washington testified that on the night of the robbery, she was in the back of the store with another employee when she saw a man "hop on the counter." Trial Tr. 80. The man was wearing a gray hoodie, gray sweat pants, black tennis shoes, "and like a half of a mask on his face." Trial Tr. 80. He pointed a gun and said "everybody get on the . . . floor." Trial Tr. 81. Washington was scared. Trial Tr. 81. When the man got down from the counter, Washington and the other employee ran out the back door and went to another restaurant to call the police. Trial Tr. 81. The robbery occurred at approximately 9:50 p.m. Trial Tr. 82.

On cross-examination, Washington testified that she immediately recognized the robber as Armstrong, and that she had seen him inside the restaurant with Hall and Hawkins "a couple" times. Trial Tr. 84–85; *see also* Trial Tr. 87 (stating that she had seen Armstrong and Hawkins at the restaurant together "[a] couple of times"). Washington stated that Hawkins was working the middle shift around the date of the robbery, from lunch until 4:00 or 5:00 p.m, and that Hall worked the night shift, beginning around 4:00 or 5:00 p.m. and ending at closing. Trial Tr. 82–83, 86. Washington did not know whether Hawkins worked on the day of the robbery. Trial Tr. 83. She further testified that the safe "[wa]s open randomly throughout the day," and that only the managers had knowledge of when more money than usual would be in the safe. Trial Tr. 83. According to Washington, Hall was "still standing" after Armstrong directed everyone to get on the ground. Trial Tr. 85.

10

Fourth, the Commonwealth called Tennille Craig ("Craig"), another restaurant employee. Trial Tr. 88. Craig testified that on the night of the robbery, she received a phone call from Washington, who told her that the restaurant had been robbed. Trial Tr. 88–89. Craig immediately went to the restaurant and observed several police officers and employees still in the building, including Washington and Hall. Trial Tr. 89. Washington was "very upset," and "emotional, hysterical, shaken." Trial Tr. 89. Hall's condition was "[t]he exact same thing; shaken, crying, very emotional." Trial Tr. 89. Craig performed an inventory of the safe and determined that $544.00 was missing. Trial Tr. 89–90.

On cross-examination, Craig testified that she directly supervised Hawkins, and that he normally worked the "morning" shift, "[t]hat can range anywhere from 11:00 to 4:00, 9:00 to 4:00, 11:00 to 5:00." Trial Tr. 91. Craig stated that no one other than a manager would have knowledge of when the safe is open or when money is taken out or placed into it. Trial Tr. 91.

Fifth, the Commonwealth called Albert Eaton, Jr. ("Eaton"), who was outside the entrance of the restaurant at the time of the robbery. Trial Tr. 92–93. While Eaton was waiting for a friend to come outside, he heard a noise, "like a gate shut or something," and turned to look towards the dumpsters at the rear of the restaurant. Trial Tr. 93. After a few seconds, he noticed "a male in gray sweat pants and gray sweatshirt" coming towards him. Trial Tr. 93. Eaton testified that the man "put a gun in my face and told me if I was to move or come in the store, that he would F-ing kill me." Trial Tr. 93. The man was wearing a ski mask. Trial Tr. 94. Eaton testified that the man "went inside and jumped the counter, and at that time, I went next door to Toys R Us and told them what was going on, and they called the police from there." Trial Tr. 94. Eaton then went back to the restaurant. Trial Tr. 94–95.

Eaton stated, "as soon as I was getting ready to enter the [restaurant] again, I heard a whole bunch, like, change and coins dropping. So I looked around back and saw the subject that came in with the - - in the gray suit leaving out the back and got into a white car." Trial Tr. 95. The man was carrying "a bag of some sort." Trial Tr. 95. Two people were in the car, including the man that got in. Trial Tr. 95. Eaton was not able to identify the person driving the car. Trial Tr. 95. On cross-examination, Eaton was not questioned further about the identity of the driver. Trial Tr. 96.

Sixth, the Commonwealth called Officer Chris Geckle ("Officer Geckle"), who responded to the robbery dispatch. Trial Tr. 97. Officer Geckle testified that he spoke with Hall when he arrived at the scene. Trial Tr. 98. Hall "was very upset, crying, and just really upset about the fact that somebody had a gun and pointed it at her." Trial Tr. 98. Washington was also "shaken up, but she was a little more composed than what Ms. Hall was." Trial Tr. 98. On cross-examination, Officer Geckle testified that he did not ask Hall if she knew the man who robbed the restaurant, and that "she did not say anything to me along th[ose] lines at the scene." Trial Tr. 99. The Commonwealth's final witness was Stanford Allen II ("Allen"), a forensic technician who was dispatched to the restaurant shortly after the robbery. Trial Tr. 100. Allen photographed and fingerprinted the scene, and also observed: a faint shoe imprint on the counter, the open safe, and change strewn around the rear of the building and out the back door.[4] Trial Tr. 100–101.

The Commonwealth rested its case, defense counsel moved to strike the charges against Hawkins, and the trial court denied the motion. Trial Tr. 105–08. The defense called three alibi witnesses before calling Hawkins.

---

[4] Photographs of the scene were entered into evidence. Trial Tr. 102, 104.

First, the defense called Wanda Smith ("Wanda"), the mother of Dawn Smith ("Dawn"), Hawkins' girlfriend and the mother of his child. Trial Tr. 109. Wanda testified as follows. On the day of the robbery, she saw Hawkins at her house on Hubbard Avenue in Suffolk between 8:00 p.m. and 10:00 p.m. Trial Tr. 110, 113, 117. It was not unusual for Hawkins to be at her house, because he and Dawn were dating and, at that time, they were waiting for their child to be born. Trial Tr. 111. Hawkins was acting "normal" on the night in question, and he and Dawn spent the evening on the "outside" of the house. Trial Tr. 112–13. When asked if she remembered what time Hawkins arrived at her residence, Wanda replied, "No. I mean, it would have been between 8:00, 9:00, somewhere around there." Trial Tr. 111. Wanda testified that her mother, Arlene Smith ("Arlene"), and Dawn were also present at the residence with Hawkins. Trial Tr. 111–12. In addition, Wanda testified that another person, Michelle Krieg ("Krieg"), who also worked at the restaurant and was friends with Hawkins and Dawn, was at the house from approximately 8:00 to 9:30 p.m., along with a child. Trial Tr. 114–15. Krieg left the house around 9:30 p.m. and, about ten minutes later, called the house to let them know that the restaurant had been robbed. Trial Tr. 114–15. Hawkins left the residence around 10:00 p.m. Trial Tr. 112. He was alone, to Wanda's knowledge, and she "guess[ed]" that he went home to his sister's residence in Norfolk. Trial Tr. 112.[5]

On cross-examination, Wanda testified that Hawkins came to the house every day, at different times, during November 2006, the month of the robbery. Trial Tr. 118. She stated that on the evening of the robbery, Hawkins arrived at the house between 8:00 p.m. and 10:00 p.m., and that "it was dark when he got there." Trial Tr. 117. Wanda also noted that her mother,

---

[5] Wanda also testified that Hawkins worked "different hours" at the restaurant, stating that "[s]ometime[s] he worked days. Sometime[s] he worked nights." Trial Tr. 112.

Arlene, had a house rule which required those who did not live at the house to leave by 10:00 p.m. Trial Tr. 117–18.

Second, the defense called Dawn. She testified that Hawkins was at the residence with her, Wanda, and Arlene "[b]etween 8:00 and 9:00" on the night in question. Trial Tr. 121–22. Dawn talked with Hawkins inside the house. Trial Tr. 122. Hawkins left the residence "[a]t 10:00, because that's [Arlene's] rule, that everybody has to be out at 10:00 that don't live there." Trial Tr. 122. Hawkins left alone. Trial Tr. 122.

On cross-examination, Dawn testified that Hawkins visited the house almost every day in November 2006. Trial Tr. 123–25. She stated, "I know for a fact [Hawkins] was there," at the house, on the night of the robbery, but then said that she did not specifically remember the date of the robbery. Trial Tr. 125. On redirect, Dawn testified that she remembered when the robbery happened, and that Hawkins was at the house on Hubbard Avenue that day, at the times she previously indicated. Trial Tr. 126.

Third, the defense called Arlene, Dawn's grandmother and the "matriarch" of the house on Hubbard Avenue. Trial Tr. 128. Arlene testified that she remembered Hawkins being at the house on the night of the robbery, when "it was dark," but she did not remember the particular time. Trial Tr. 129. She stated that Hawkins left before 10:00 p.m., but "couldn't say" exactly when. Trial Tr. 129. She noted that Hawkins "would always stay as long as he possibly could." Trial Tr. 130.

Finally, the defense called Hawkins, who testified as follows. Trial Tr. 135–43. Hawkins came to know Armstrong "[t]hrough transactions of selling marijuana on the streets." Trial Tr. 135. Armstrong would buy from Hawkins "if somebody in the neighborhood didn't have it." Trial Tr. 135. Prior to the robbery, Hawkins and Armstrong had a dispute about

14

$100.00 to $150.00 worth of drug money.  Trial Tr. 135, 137.  Hawkins had given Armstrong marijuana to sell on his behalf, and Armstrong "was supposed to bring back [the] money" to Hawkins, but never did.  Trial Tr. 135.  Around the time of this dispute, Hawkins had a conversation with Hall, who he knew from the restaurant, and asked her if she had seen Armstrong.  Trial Tr. 135, 138.  Hall replied that she had not, but a co-worker at the restaurant told Hawkins that he had seen Armstrong pick Hall up from work.  Trial Tr. 135–36.  When Hawkins called Hall about the lie, she said she did not want to get involved in the dispute between Armstrong and Hawkins.  Trial Tr. 136.

Hawkins testified that he normally worked between the hours of 10:00 a.m. and 5:00 p.m. Trial Tr. 138.  Armstrong and others came to the restaurant to buy marijuana from Hawkins. Trial Tr. 139.  After work, Hawkins routinely went to Pughsville where he hung out and visited Dawn.  Trial Tr. 138.

On the night of the robbery, Hawkins was in the Pughsville neighborhood in Suffolk, at the home of Dawn, Wanda, and Arlene.  Trial Tr. 136.  He arrived at 7:00 or 8:00 p.m., and left around 10:00 p.m.  Trial Tr. 136.  Before leaving, he received a phone call from "somebody telling [him] that [the restaurant] had just got robbed."  Trial Tr. 137.  After leaving, Hawkins stayed in the neighborhood and "went to the next street over to finish smoking marijuana with [his] friends."  Trial Tr. 137.

When asked why he thought Armstrong testified against him, Hawkins said: "Because we were beefing on the streets, and when I got to jail, me and him, you know, when I learned that he was in there, when he came into my pod, me and him was getting ready to get in to it over the same dispute."  Trial Tr. 139.  When asked why he thought Armstrong picked on him and not someone else, Hawkins stated: "Because me and him beefing.  That's the only way I can see it.

15

I mean, if I'm convicted of something, I'm going to take somebody down, too, that I know I'm beefing with. I mean, obvious to see that that's the reason why he doing it." Trial Tr. 139.

On cross-examination, Hawkins testified that he had worked at the location of the robbery for almost a year prior to his arrest. Trial Tr. 140. He knew the location of the restaurant safe, the entrances, the exits, and one of the panic buttons. Trial Tr. 140. Hawkins did not know when the safe would be open, "didn't know anything about the safe," and was never around when the safe was open, because he was a cook and was always in the back of the restaurant. Trial Tr. 140–41. Hawkins denied giving any thought to robbing the restaurant. Trial Tr. 141. He further denied discussing the plan to rob the restaurant with Armstrong in the presence of Hall, and denied threatening her. Trial Tr. 137, 142–43. He also described Hall's "beef" against him, stating that "[Armstrong] was her boyfriend at the time, and I stopped talking to her because she lied to me. You know, she was supposed to been my, like, sister, like she was a part of the family." Trial Tr. 142.

Hawkins further testified that he had known Armstrong for a little over one month at the time of the robbery and that Armstrong drove a white, four-door car. Trial Tr. 141–42. Hawkins affirmed that he had one prior felony. Trial Tr. 142. He stated again that he was at the house in Suffolk during the robbery, that he was telling the truth, and that Armstrong was not. Trial Tr. 142–43.

### III.    ANALYSIS

**A.    Hawkins' petition is time barred.**

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") provides a one-year statute of limitations for section 2254 petitioners. 28 U.S.C. § 2244(d)(1). Section 2244(d)(1)(A) provides that the one-year period begins to run from "the date on which the

16

judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." This time period tolls when "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim" is pending. 28 U.S.C. § 2244(d)(2).

Pursuant to Section 2244(d)(1)(A), Hawkins' federal habeas petition is untimely. The Supreme Court of Virginia refused Hawkins' direct appeal on June 22, 2009. *Hawkins v. Commonwealth*, Record No. 082446 (Va. June 22, 2009); ECF No. 12-4. His conviction became final on Monday, September 21, 2009, at the expiration of his time to file a petition for certiorari with the Supreme Court of the United States. *See* 28 U.S.C. § 2244(d)(1)(A); Sup. Ct. R. 13(1) (directing that a notice of appeal must be filed within 90 days after entry of final judgment); *Harris v. Hutchinson*, 209 F.3d 325, 328 n.l (4th Cir. 2000) (holding that a judgment became final when the 90-day period for filing a petition for certiorari with the United States Supreme Court expired). Accordingly, Hawkins had until September 21, 2010 to file his federal habeas petition.[6] Hawkins did not mail his petition, however, until May 18, 2016, over five and one half years too late.

A petitioner may be entitled to belated commencement of the statute of limitations under 28 U.S.C. § 2244(d)(1)(B), which provides that the one-year period may begin to run from "the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action." In his reply, Hawkins contends that he is entitled to statutory tolling pursuant to this provision. Resp. to Mot. to Dismiss, ECF No. 15 at 4, 6, 9. Hawkins appears to argue that Virginia state courts adhere to a "strict policy" that "attaches a high degree of finality

---

[6] Hawkins' motions to vacate did not toll the federal limitations period, as both motions were filed after September 21, 2010, the date on which the federal limitations period expired.

to judgment," and that this policy "impeded any realistic avenue for Hawkins to plead his case in the state courts." *Id.* at 5–6. He further contends that his "pro-se pleadings were not afforded the less stringent standard of review." *Id.* at 5. In addition, Hawkins suggests that the alleged ineffectiveness of his trial and appellate counsel, as well as the fact that he was not provided counsel for his state habeas proceedings, make his petition timely under section 2244(d)(1)(B). *Id.* at 6–7, 9. These generalized allegations, however, do not constitute any unlawful, state-created impediment to the timely filing of Hawkins' federal habeas petition. As a result, Hawkins is not entitled to statutory tolling under section 2244(d)(1)(B).

**B.      Hawkins is not entitled to equitable tolling predicated upon actual innocence.**

To have the merits of his constitutional claims reviewed by this Court, Hawkins seeks an equitable exception from the statute of limitations based on a showing of actual innocence. *See* ECF No. 1 at 10, 13–14. The Supreme Court has recognized that "actual innocence, if proved, serves as a gateway through which a petitioner may pass" to bring claims after the statute of limitations expires. *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013). This exception to the statute of limitations "applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" *McQuiggin*, 133 S. Ct. at 1933 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). More specifically, the exception requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. If the petitioner provides the court with reliable, newly discovered evidence, then the court weighs the new evidence in light of the previous admissible and inadmissible evidence and makes a "probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* at 329.

18

The *Schlup* standard is an exceedingly high burden to satisfy and thus only permits review in "extraordinary" cases. *House v. Bell,* 547 U.S. 518, 538 (2006); *see also Schlup*, 513 U.S. at 327–29. Further, a petitioner's actual innocence claim "'does not by itself provide a basis for relief.'" *Teleguz v. Pearson*, 689 F.3d 322, 328 (4th Cir. 2012) (quoting *Coleman v. Hardy*, 628 F.3d 314, 318 (7th Cir. 2010)). Instead, a petitioner's "claim of innocence is . . . 'a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" *Schlup*, 513 U.S. at 315 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

To support his claim of actual innocence, Hawkins offers the signed affidavit, dated August 15, 2008, of Robert Montgomery ("Montgomery"), who was incarcerated with Hawkins and Hawkins' co-defendant, Armstrong. ECF No. 1 at 16. The affidavit appears to have been procured by an investigator working for Hawkins' appellate counsel. *See id.*

According to the affidavit, while Montgomery and Armstrong were in jail together, Armstrong told Montgomery that he and his girlfriend had planned a robbery of a fast food restaurant and that, "[i]f anything went wrong, the plan was for them to frame 'Pig' for the robbery." ECF No. 1 at 16. Armstrong also reportedly stated "that things went wrong and he was charged for the robbery." *Id.* In addition, the affidavit recounts that, sometime after this conversation with Armstrong, Montgomery moved to another jail housing location where he met Hawkins. *Id.* Hawkins reportedly told Montgomery that his street name was "Pig" and that he "had gotten thirty years for a robbery he did not commit." *Id.* The affidavit also states that Montgomery "heard" that Hawkins and Armstrong "had had a 'beef' on the street and that is why Mr. Armstrong framed Mr. Hawkins." *Id.*

19

Montgomery's affidavit, which is largely cumulative of the defense offered at trial, is insufficient to make a credible showing of actual innocence. First, as noted above, although the evidence was not available to defense counsel at the time of trial, defense counsel presented the evidence to the trial court when it was discovered.[7] Montgomery signed the affidavit on August 15, 2008. On August 27, 2008, Hawkins, through counsel, filed a motion to "reconsider and modify [his] sentence," based on the affidavit and Montgomery's willingness to testify. Mot. to Recons. and Modify Sentence, *Commonwealth v. Hawkins*, CR07-2021 through 2023 (Va. Cir. Ct. Aug. 27, 2008). The trial court denied Hawkins' request for a hearing on the matter and found that "[t]here are no facts alleged to support a change in the case which warrants modification or reconsideration of the defendant's original sentence." *Commonwealth v. Hawkins*, CR07-2021 through 2023 (Va. Cir. Ct. Sept. 2, 2008). The affidavit may be "newly discovered" evidence for purposes of *Schlup*. *See Royal v. Taylor*, 188 F.3d 239, 244 (4th Cir. 1999) ("The *Schlup* Court adopted a broad definition of 'new' evidence to be considered in such cases: a petitioner must offer 'new reliable evidence . . . *that was not presented at trial*.'")

---

[7] In his petition, Hawkins states that his attorney failed to submit the affidavit on appeal. ECF No. 1 at 7, 10. Hawkins' counsel filed a petition for appeal in the Court of Appeals on April 24, 2008, before the affidavit existed. *Hawkins v. Commonwealth*, Record No. 0053-08-1 (Va. Ct. App. Apr. 24, 2008). Montgomery signed the affidavit on August 15, 2008. ECF No. 1 at 16. On August 21, 2008, the Court of Appeals of Virginia denied Hawkins' appeal. *Hawkins v. Commonwealth*, Record No. 0053-08-1 (Va. Ct. App. Aug. 21, 2008); ECF No. 12-2. On August 27, 2008 Hawkins' counsel filed a motion to reconsider and modify the sentence, based on the affidavit and Montgomery's willingness to testify. *Commonwealth v. Hawkins*, CR07-2021 through 2023 (Va. Cir. Ct. Aug. 27, 2008). On September 2, 2008, the trial court denied the request for a hearing on that motion and found that a modification or reconsideration of Hawkins' sentence was unwarranted. *Commonwealth v. Hawkins*, CR07-2021 through 2023 (Va. Cir. Ct. Sept. 2, 2008). The next day, counsel moved for reconsideration of the Court of Appeals' August 21, 2008 denial, without mentioning Montgomery or the affidavit. *Hawkins v. Commonwealth*, Record No. 0053-08-1 (Va. Ct. App. Sept. 3, 2008). A three-judge panel denied the petition for appeal on November 13, 2008. *Hawkins v. Commonwealth*, Record No. 0053-08-1 (Va. Ct. App. Nov. 13, 2008); ECF No. 12-3. Hawkins' counsel filed an appeal in the Supreme Court of Virginia on December 15, 2008, without mentioning Montgomery or the affidavit. *Hawkins v. Commonwealth*, Record No. 082446 (Va. Dec. 15, 2008).

(quoting *Schlup*, 513 U.S. at 324) (emphasis added). However, the Court notes that the trial court reviewed the affidavit (and the associated motion) at the appropriate time, over eight years ago.

Second, the fact that Montgomery subscribed to the affidavit while he and Hawkins were incarcerated together "'call[s] into question' the affidavit's reliability." *Fentress v. Clarke*, No. 1:15cv965, 2016 WL 4118916, at *4 (E.D. Va. July 28, 2016) (quoting *Milton v. Sec'y, Dep't of Corr.*, 347 F. App'x 528, 531 (11th Cir. 2009)). At the time the affidavit was written, Montgomery and Hawkins had known each other for approximately two months, which would have provided them sufficient time to develop the details included in the affidavit and to ensure those details were consistent with the evidence presented at trial. *See id.*; ECF No. 1 at 16. Further, when Montgomery came forward, he was serving a three-year sentence for a robbery conviction. ECF No. 1 at 16. This criminal history provides an avenue for impeaching his reliability. *See Randall v. Clarke*, No. 3:14cv562, 2015 WL 4705506, at *12 (E.D. Va. Aug. 6, 2015) ("The sheer fact that [the] affiants have a history of felony convictions casts doubt on the reliability of their testimony."), *appeal dismissed*, 648 F. App'x 376 (4th Cir. 2016).

In addition, Hawkins' delay in submitting this affidavit is troubling. Although an "unjustifiable delay on a habeas petitioner's part" does not constitute "an absolute barrier to relief," timing is a factor that the Court should consider "in determining whether actual innocence has been reliably shown." *McQuiggin*, 133 S. Ct. at 1928. Here, the affidavit was completed on August 15, 2008, and was presented to the trial court less than two weeks later. In 2011 and 2012, Hawkins moved to vacate his convictions, but did not mention Montgomery or the affidavit in those filings. *See* ECF Nos. 12-7, 12-11. Then, in 2016, Hawkins submitted his federal petition, raising the matter anew. ECF No. 1. It is reasonable to assume that once a

wrongly convicted individual discovers possibly exculpatory evidence, that individual would seek to submit the evidence to the Court in a speedy fashion. In this case, however, after the evidence was initially presented to the trial court, Hawkins declined to press the issue in the state system and waited over seven years to submit the affidavit to this Court. That delay causes the Court to discount the reliability of this evidence.[8]

Third, considering the evidence presented at trial along with the affidavit, Hawkins has failed to show that "it is more likely than not that no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327. At trial, Armstrong testified that Hawkins: came up with the idea to rob the restaurant and enlisted Armstrong's help so that Hawkins would not get caught; discussed with Armstrong a detailed plan for how to execute the robbery; drove Armstrong to the scene; waited for Armstrong to rob the restaurant; drove Armstrong away from the scene; went to a particular residence in order to establish an alibi; then returned to Norfolk to divide up the money. Trial Tr. 29–34, 37–40. Armstrong provided specific details about how he carried out the robbery. He stated that he entered the restaurant wearing gray sweat pants, a gray sweat shirt, and a ski mask. Trial Tr. 34. He told the employees to "get down," while pointing a BB gun, hopped over the counter, and took money from the safe. Trial Tr. 34–35. He left through the back entrance, dropping coins along the way. Trial Tr. 36–37. When Armstrong got outside, Hawkins was waiting in the car. Trial Tr. 37. Armstrong got in and they fled the scene. Trial Tr. 37.

---

[8] The Court also notes that although the affidavit appears to have been signed in the presence of a notary public, it was not signed under penalty of perjury.

Three witnesses, who were present at the scene, corroborated the details of Armstrong's testimony.[9] Eaton testified that a man, wearing gray sweat pants, a gray sweat shirt, and a ski mask, approached him, put a gun in his face, and threatened him. Trial Tr. 93–94. Eaton observed the man enter the restaurant and jump the counter. Trial Tr. 94. Later, Eaton heard coins dropping and observed the man, carrying a bag, leave out the back entrance and get into a white car, driven by another individual. Trial Tr. 95. Washington, the assistant manager, testified that she saw a man, wearing gray sweat pants, a gray hoodie, and a mask, who hopped on the counter and told everyone to get on the floor while pointing a gun. Trial Tr. 80–81. Hall testified that a man entered the restaurant wearing a gray jumpsuit and a ski mask. Trial Tr. 60. He told everyone to get down on the floor, while waving a gun. Trial Tr. 60. The man went over the counter and retrieved something from the safe. Trial Tr. 61. Washington and Hall identified the man as Armstrong. Trial Tr. 62, 84–85.

Moreover, Hall corroborated Armstrong's testimony concerning the conversation between Hall, Armstrong, and Hawkins, during which Armstrong told Hall that they were going to rob the restaurant. Trial Tr. 33, 58–59. She also testified that Hawkins called her five minutes before Armstrong entered the restaurant and told her that "it was about to happen." Trial Tr. 59.

Considering that Armstrong provided the trial court with a detailed description of the planning and execution of the robbery, that the witnesses present corroborated Armstrong's account, and that Hall testified to Hawkins' involvement the day before and immediately prior to the incident taking place, the Court finds Armstrong's testimony implicating Hawkins to be persuasive. In contrast, the alibi evidence presented at trial was unconvincing. Dawn, Wanda, and Arlene placed Hawkins at their residence on the night in question, but provided approximate

---

[9] In addition, Officer Geckle, the forensic technician, and Craig provided testimony consistent with that offered by Armstrong and the witnesses who were present during the robbery.

times which suggested that that they recalled his habit of visiting their house rather than his presence there on the particular night in question. *See* Trial Tr. 109–34. Hawkins' testimony that Armstrong, who he had known for about one month before the incident, set him up on felony robbery charges because they were "beefing" over $150 worth of drug money, and that Hall was in on it because of her relationship with Armstrong, is also less than convincing. *See* Trial Tr. 135–36, 139, 141–42.

Weighing Montgomery's affidavit along with the evidence presented at trial, the Court cannot find that "no reasonable juror would have convicted" Hawkins. *Schlup*, 513 U.S. at 327. First, as discussed above, an affidavit from a fellow prisoner is less than reliable. Second, Montgomery did not know Hawkins until the two were incarcerated together and had no prior or personal knowledge of the offense; that is, Montgomery was not with Hawkins at any time on or around the date of the robbery, nor was he at the restaurant on the night in question. ECF No. 1 at 16. *See also* Mot. to Recons. and Modify Sentence, *Commonwealth v. Hawkins*, CR07-2021 through 2023 (Va. Cir. Ct. Aug. 27, 2008) ("Montgomery has no known association with Derrick Armstrong, Kristen Hall or the defendant Marquez Hawkins, and there is no indication that he would have been privy to any of the aforementioned information other than through . . . Armstrong"). Third, the affidavit, which suggests that Armstrong framed Hawkins, tends to support a defense theory of the case and to undermine Armstrong's testimony; however, "[n]ew evidence that merely undermines the state's theory of the case but does not rebut specific jury findings of guilt is insufficient to demonstrate actual innocence." *Buckner v. Polk*, 453 F.3d 195, 200 (4th Cir. 2006) (citing *Herrera*, 506 U.S. at 418–19).

Finally, the defense described in the Montgomery affidavit was squarely and effectively put before the factfinder at trial. Having seen and heard testimony from Armstrong, Hawkins,

24

Hall, the alibi witnesses, and Eaton (the witness who placed a second person in the getaway car), the factfinder concluded that the Commonwealth proved its case beyond a reasonable doubt and rejected the defense. The affidavit of a jailhouse witness, without personal knowledge of the events of the robbery, provides no compelling basis for questioning the factfinder's determination. Because Hawkins' evidence is of questionable reliability and would not prevent a reasonable juror from finding him guilty, his claim of actual innocence does not excuse his failure to comply with the federal statute of limitations.

## IV. RECOMMENDATION

For the foregoing reasons, the Court RECOMMENDS that respondent's motion to dismiss, ECF No. 10, be GRANTED, and the petition for a writ of habeas corpus, ECF No. 1, be DENIED and DISMISSED WITH PREJUDICE.

## V. REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

25

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
United States Magistrate Judge

Robert J. Krask
United States Magistrate Judge

Norfolk, Virginia
July 5, 2017